UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TRACY ANNE BEDSAUL,

Plaintiff,

v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.

No. CV 12-2527 AGR

MEMORANDUM OPINION AND ORDER

Plaintiff Tracy Anne Bedsaul filed this action on March 30, 2012. Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the magistrate judge on May 14, 2012 and September 19, 2103. (Dkt. Nos. 11, 18.) On January 7, 2013, the parties filed a Joint Stipulation ("JS") that addressed the disputed issues. The court has taken the matter under submission without oral argument.

Having reviewed the entire file, the decision of the Commissioner is reversed and this matter is remanded for payment of benefits for the period beginning April 3, 2009, and for further proceedings as to whether to make representative payments and selection of a representative payee, as appropriate.

## I.

## PROCEDURAL BACKGROUND

On May 8, 2007, Bedsaul filed an application for supplemental security income, alleging a disability onset date of July 1, 1997. Administrative Record ("AR") 12. The application was denied initially and on reconsideration. AR 12, 57-58. On April 29, 2009, an Administrative Law Judge ("ALJ") conducted a hearing at which Bedsaul, a vocational expert ("VE"), and a certified addiction specialist appearing as a lay witness on Bedsaul's behalf testified. AR 27-56. On May 20, 2009, the ALJ issued a decision denying benefits. AR 9-20. On July 20, 2009, the Appeals Council denied Bedsaul's request for review. AR 1-4.

Bedsaul filed an action in the Central District. On April 14, 2011, this court filed a Report recommending that the action be remanded to the Commissioner for reconsideration of Bedsaul's residual functional capacity ("RFC"), her credibility and the treating psychiatrist's opinion. AR 456-68. On May 31, 2011, the district court adopted this court's Report and Recommendation, entered judgment for Bedsaul and remanded the action to the Commissioner for further proceedings. AR 455.

On October 17, 2011, the Appeals Council vacated the ALJ's decision and remanded the case to an ALJ for further proceedings. AR 471. The Appeals Council also combined Bedsaul's claim with a subsequent claim for supplemental security income filed by Bedsaul on August 11, 2009. AR 453, 471; JS 4.

On December 12, 2011, the same ALJ conducted a hearing pursuant to the remand order and the subsequent claim for benefits. Bedsaul and a VE testified at the hearing. AR 384-411. On January 13, 2012, the ALJ issued a decision denying benefits. AR 342-52.

This action followed.

## II.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court reviews the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards. *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (per curiam); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523. In determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257. When the evidence is susceptible to more than one rational interpretation, the court must defer to the Commissioner's decision. *Moncada*, 60 F.3d at 523.

## III.

## DISCUSSION

### A. Disability

A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003).

**B. The ALJ's Findings**

Following the five-step sequential analysis of disability, *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006),[1] the ALJ found that Bedsaul has the severe impairments of bipolar 1 disorder, a history of chronic substance induced mood disorder, and methamphetamine and opiate dependence in remission. AR 14, 344. She has the RFC to perform a full range of work at all exertional levels, but "is limited to simple, repetitive tasks that do not require any significant interaction with the general public." AR 348; *see also* AR 17. She can tolerate only "incidental contact with the public." AR 348. "She is precluded from jobs requiring rapid paced high production quotas." AR 348; *see also* AR 17. She has no past relevant work, but jobs exist in significant numbers in the national economy that she can perform. AR 19, 351.

**C. Treating Records**

Bedsaul contends the ALJ improperly considered her treating records from CARES (Crisis and Recovery Emergency Services), which, during the relevant period, contains records and opinions from Drs. Feliciano, Lin, Tilton, Crocker and Samson. As of the date of the most recent hearing, Bedsaul lives in permanent supportive housing.[2] AR 387.

An opinion of a treating physician is given more weight than the opinion of a non-treating physician. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). To reject an uncontradicted opinion of a treating physician, an ALJ must state clear and convincing reasons that are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d

---

[1] The five-step sequential analysis examines whether the claimant engaged in substantial gainful activity, whether the claimant's impairment is severe, whether the impairment meets or equals a listed impairment, whether the claimant is able to do his or her past relevant work and whether the claimant is able to do any other work. *Lounsburry*, 486 F.3d at 1114.

[2] The facility is Faulding Hotel. Bedsaul graduated from Hotel de Rivera, a dual diagnosis program for individuals who have mental illness combined with alcohol or drug abuse problems. AR 726.

1211, 1216 (9th Cir. 2005). When, as here, a treating physician's opinion is contradicted by another doctor, "the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record. This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Orn,* 495 F.3d at 632 (citations omitted and internal quotations omitted). When the ALJ declines to give a treating physician's opinion controlling weight, the ALJ considers several factors, including the following: (1) the length of the treatment relationship and frequency of examination;[3] (2) the nature and extent of the treatment relationship;[4] (3) the amount of relevant evidence supporting the opinion and the quality of the explanation provided; (4) the consistency with the record as a whole; and (5) the specialty of the physician providing the opinion. *See Orn*, 495 F.3d at 631; 20 C.F.R. § 404.1527(d)(1)-(6). "When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict." *Thomas*, 278 F.3d at 956-57 (citation and quotation marks omitted).

In a report dated January 25, 2008, Dr. Feliciano stated that he had treated Bedsaul weekly since May 2007. AR 302. He found marked limitations in Bedsaul's activities of daily living, social functioning, and concentration, persistence or pace, with continual episodes of deterioration or decompensation. AR 306. The term "marked" was defined as the "[a]bility to function in this area is seriously limited." AR 304.

---

[3] "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(d)(2)(I).

[4] "Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(d)(2)(ii).

Bedsaul had marked limitations in fifteen of the sixteen categories of mental abilities needed to do unskilled work. AR 304-05. Dr. Feliciano explained that "severe mood swings, paranoia make it difficult to understand even simple instructions and to interact with others; she is easily confused and panics." AR 305. In addition, she is "unable to deal with a structured work routine, unable to follow simple directions." *Id.* Her Global Assessment of Functioning ("GAF") was 42.[5] AR 302.

On April 3, 2009, Dr. Feliciano stated he had been treating Bedsaul in "one on one weekly [sessions] since 5-1-07" and in a "dual diagnosis group, 1x week since 2-1-08." AR 333. Although her GAF had improved to 55 (*id.*),[6] Dr. Feliciano continued to assess marked or frequent limitations in activities of daily living, social functioning, and concentration, persistence, or pace, with continual episodes of deterioration or decompensation. AR 337. He explained that Bedsaul's "severe mental illness mood swings and paranoia prevent [her] from being able to follow simple directions[;] [she is] easily confused." AR 336. Bedsaul continued to be "unable to deal with a structured work routine and environment." *Id.*

In the 2009 decision, the ALJ rejected Dr. Feliciano's opinions because they "were inconsistent with his progress notes." AR 19, 466. Dr. Feliciano's notes showed "good control of mental health symptoms with medication and counseling and few mental health findings." AR 15, 466. The ALJ also noted Bedsaul's "excellent response to the substance abuse treatment program, and her smooth transition to independent living." AR 19, 466. She noted that Dr. Feliciano's opinions were inconsistent with "the weight of the medical evidence and the other functional capacity assessments in the

---

[5] A GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning, such as being unable to keep a job. DSM IV–TR at 34.

[6] A GAF of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM IV-TR at 34.

record." AR 15, 19, 466-67. The state agency psychiatrists concluded Bedsaul did not have a severe mental impairment. AR 19, 467.

In the 2011 Report and Recommendation, this court noted that Dr. Feliciano's treatment notes in 2007 reflect that Bedsaul reported doing well on medication and exhibited no "psychosis, mania, suicidal or homicidal ideation or cognitive deficits." AR 229, 276, 280, 285, 467. However, Dr. Feliciano's treatment note on January 25, 2008 reflects that Bedsaul reported feeling depressed and suffering from insomnia. AR 330, 467. This court noted that Bedsaul appears to have experienced her relapse shortly thereafter. AR 327, 467. However, the record at that time contained no non-medication related treatment notes after January 2008. This court noted that Bedsaul's case worker, Crable, testified at the April 29, 2009 hearing that Bedsaul had been a "tremendous client" who has done all of the work asked of her, completed an 18-month long residential dual diagnosis program "with flying colors" and had only one relapse.[7] AR 463 (citing AR 31, 33-34). As of April 29, 2009, Crable felt Bedsaul could not show up for work on a regular basis in a full-time job. AR 463 (citing AR 37). She was learning to navigate daily stresses without drugs and deal with anxiety in public. When one puts a client into a work environment too soon, "the client backslides." AR 463 (citing AR 36). The Report recommended that the matter be remanded.

In the 2012 decision, the ALJ again rejected the January 2008 and April 2009 assessments of Dr. Feliciano. AR 345. She noted that the assessments "were not consistent with the medical evidence or [with Dr. Feliciano's and other mental health professionals'] reports of significant improvement in her mental health symptoms when she is compliant with taking her medications" and is sober.[8] AR 345, 350. She also

---

[7] Medical records on remand confirm the one relapse occurred in early 2008. AR 619.

[8] To the extent Bedsaul contends the ALJ should have re-contacted Dr. Feliciano for clarification of his opinions, her claim fails. JS 34 (citing SSR 96-5p). The ALJ did not err in failing to contact Dr. Feliciano for clarification of his opinions because there is no

noted that Dr. Feliciano's opinions conflicted with records from Santa Barbara County Mental Health. AR 345. An ALJ may reject a treating physician's opinion that is unsupported or contradicted by treatment records. *See Bayliss*, 427 F.3d at 1216; *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003).

However, the ALJ's finding is not supported by substantial evidence during the period beginning April 3, 2009, the date of Dr. Feliciano's opinion, which is consistent with Crable's testimony in the same month.

The record on remand included medical evidence through September 2011. AR 610-732. In November 2009, Dr. Lin's notes indicate Bedsaul was fearful of being abducted in trucks and being electrocuted. She had been off her medications "because she was too fearful to leave her place" to pick them up. AR 677. Dr. Lin noted paranoid delusions, anxiety and a dysphoric, tearful affect. She diagnosed psychosis NOS and rule out recent stimulant abuse.[9] *Id.* In March 2010, Bedsaul again presented with paranoid delusions about abduction and electrocution. She was extremely anxious and afraid to leave her home or be in public. She had not been taking her medications since January 2010 because she had to take her daughter to the ER on the date they were ordered. Dr. Lin again diagnosed psychosis NOS, rule out stimulant abuse. AR 675. In November 2010, Dr. Tilton noted paranoia about abduction and electrocution. Bedsaul does not watch TV and turns off all electrical devices in her home. Bedsaul claimed that Risperdal did not help and she had not taken Remeron because she could not afford it. She felt calmer with her boyfriend because he could protect her. AR 700. Dr. Tilton noted paranoid delusions, poor insight and fair judgment. *Id.* Dr. Tilton

---

indication of any ambiguity in the record. *See* SSR 96-5p ("For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.").

[9] As described below, in 2011 police picked up Bedsaul based on her bizarre behavior and took her to an emergency room, where she tested negative for all drugs. AR 704.

diagnosed psychosis NOS, rule out stimulant abuse, and anxiety disorder NOS with panic attacks. He assessed a GAF of 43 or 45 with a poor prognosis. *Id.*

On August 20, 2011, police picked up Bedsaul when she was riding her bike down the street and "dragging another." AR 704. She appeared under the influence but "rambled on about being part of CARES." *Id.* Bedsaul was taken to an emergency room, where her drug tests were all negative.[10] Bedsaul presented as hypomanic, possible bipolar disorder, some pressured speech and tangential thinking. AR 701. A CARES mobile crisis worker was called to the ER. *Id.* On August 24, 2011, Bedsaul was seen by her therapist, Mr. Money. She had stopped taking her medications about six months earlier and stopped going to CARES.[11] She wanted to restart services with CARES. Bedsaul was assessed with a GAF of 38, severely disabled with a guarded prognosis and unstable on medications. AR 701-02. She was scheduled for a CARES assessment. AR 701.

On August 30, 2011, Dr. Crocker completed an extensive CARES assessment. AR 703-23. Bedsaul's symptoms included depression, tearfulness, anhedonia, isolating, worthlessness and suicidal thoughts without a specific plan. AR 704, 711-12. She expressed fears of abduction and electrocution, and actually being able to feel the electricity in her legs when she has these thoughts. AR 704-05. She feels she is "almost hit" by cars when she tries to get away. AR 705. Dr. Crocker noted a sad mood, anxious affect, hallucinations and delusions. AR 716-17. Bedsaul had fair insight and judgment. AR 717. Dr. Crocker diagnosed mood disorder NOS, rule out bipolar 1 disorder; psychotic disorder NOS, rule out schizoaffective disorder and substance induced psychotic disorder. Bedsaul's GAF was 50. AR 721. Dr. Crocker

---

[10] Specifically, she tested negative for amphetamine, cocaine, opiates, marijuana, benzo and methadone. AR 701.

[11] According to a later medical record, Bedsaul did not return to CARES because she did not like the physician at the time. AR 726.

indicated that Bedsaul's goals were to reduce symptoms of mental illness, achieve 100% compliance with medications, attend all doctor appointments and develop self care and coping skills, and develop psychiatric relapse prevention skills. AR 724. Dr. Crocker prescribed daily 30-minute sessions with Mr. Money for one year. AR 724-25.

On September 9, 2011, Dr. Samson treated Bedsaul and completed a Residual Functional Capacity - Mental form. AR 726-32. Dr. Samson based his assessment on his review of the chart with CARES staff and one face-to-face visit.[12] AR 732. Dr. Samson noted that Bedsaul had been treated at CARES for three years of "episodic and irregular visits." AR 727. Bedsaul did not or "cannot follow through – recently afraid of MD." *Id.* Bedsaul was afraid to leave home but found one Zyprexa tablet and was able to come to her appointment. She had a guarded prognosis for slight improvement. *Id.* She had inappropriate affect, mood disturbance, paranoid thinking, seclusiveness, bipolar symptoms, persistent irrational fears, perceptual disturbances, delusions, emotional lability, pathologically inappropriate suspiciousness and recurrent severe panic attacks. AR 728.

With respect to work capacity, Dr. Samson opined that Bedsaul had no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; or to accept instructions and respond appropriately to criticism from supervisors. AR 729. She was unable to meet competitive standards in terms of maintaining regular attendance and punctuality; maintaining attention for two-hour segments; sustaining an ordinary routine without special supervision, dealing with normal work stress; and working with co-workers without unduly distracting them or exhibiting behavioral extremes. *Id.* Dr. Samson explained that his assessment was based on her paranoia, disassociative behaviors and strange conduct that resulted in

[12] During examination, Bedsaul felt paranoid about her boyfriend and unable to continue seeing him. AR 726. Dr. Samson observed that Bedsaul's panic attacks sounded more like acute decompensation and possible disassociative state. *Id.*

her being taken to the hospital. AR 729-30. Bedsaul had an anxiety disorder and complete inability to function independently outside the home. AR 730. She was unable to meet competitive standards in the areas of maintaining socially appropriate behaviors and interacting appropriately with the public. She rode her bike but was limited in her ability to take a bus due to her agoraphobia and paranoid symptoms. Bedsaul had marked limitations in activities of daily living and maintaining concentration, persistence, or pace; and extreme limitations in maintaining social functioning. AR 731. Bedsaul was not malingering. Dr. Samson estimated that Bedsaul would be absent more than four days per month. AR 732.

The ALJ did not provide specific and legitimate reasons supported by substantial evidence for rejecting the longitudinal treating records at CARES for the period beginning April 3, 2009. Those records must be credited. *See Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006). According to those records, Bedsaul is not capable of full-time work on a sustained basis. *See Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998); 20 C.F.R. § 404.1512(a). "[O]ccasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability." *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995). Even assuming the ALJ could reasonably infer that Bedsaul's condition would improve somewhat if she were compliant with medication, it does not necessarily follow that her impairments, when treated, would no longer seriously affect her ability to function in the workplace. *See Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1201 (9th Cir. 2008) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.") (citation and quotation marks omitted). The medication, together with 24/7 support from CARES, has enabled Bedsaul to leave her home for weekly appointments at CARES, annual appointments for housing benefits and her hearing before the ALJ.

There is no indication Bedsaul would be able to work full-time five days per week as of the date of the ALJ's decision.[13]

The court has concerns that Bedsaul is unable to manage her own benefits. Although Dr. Feliciano indicated in April 2009 that Bedsaul could manage benefits in her own interest (AR 337), Dr. Samson responded that her ability to do so was "unknown" as of September 2011. AR 732. The treating records indicate that Bedsaul's paranoid delusions and perceptual disturbances became worse after April 2009. Accordingly this matter will be remanded for proceedings pursuant to 20 C.F.R. §§ 416.601-630.

## IV.

## ORDER

IT IS HEREBY ORDERED that the decision of the Commissioner is reversed and this matter remanded for payment of benefits for the period beginning April 3, 2009, and for further proceedings as to whether to make representative payments and selection of a representative payee, as appropriate.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment herein on all parties or their counsel.

DATED: September 23, 2013

Alicia G. Rosenberg

ALICIA G. ROSENBERG
United States Magistrate Judge

[13] Given this result, it is unnecessary to reach Bedsaul's other arguments.